UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:10-cv-24143 – MORENO/TORRES

RAC Insurance Partners, LLC,   )
Plaintiff   )
   )
v.   )
   )
Clarendon National Insurance Company,   )
Defendant.   )
   )
_____)

# DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Defendant, CLARENDON NATIONAL INSURANCE COMPANY, (hereinafter "Clarendon" or "Defendant"), who by and through its undersigned counsel, files this memorandum of law in opposition to Plaintiff's Motion for Summary Judgment, and in support thereof states as follows:

## PRELIMINARY STATEMENT

For almost two years, plaintiff RAC Insurance Partners, LLC ("RAC") has wrongfully refused to remit to defendant Clarendon over half a million dollars of excess commission that RAC, as Clarendon's agent and fiduciary, is contractually obligated to return.

Procedurally, this action represents RAC's attempt, first, to make an end-run around its irrevocable agreement to litigate its commission dispute with Clarendon in New York, and second, to secure, by this motion, a premature judgment on the merits when discovery has barely begun.

Substantively, RAC contends that Clarendon's right to return of the commission in question was unambiguously expunged by a certain settlement agreement.  However, the settlement agreement at issue releases, by its express terms, only claims arising under or relating to an entirely different agreement from the one giving rise to Clarendon's claim for commission. Moreover, the settlement agreement expressly exempts from release, in accordance with basic hornbook and governing Florida law, claims -- like Clarendon's commission claim – that had not

yet accrued at the time the settlement agreement was executed. As a result, RAC is obliged to press its argument regarding the settlement agreement not by giving due weight, as required by applicable rules of contract construction, to all of the terms of the agreement read as a whole, but rather by ignoring whatever words, and even whole clauses, that it chooses to, and conjuring up others that appear nowhere in the text.

## **PROCEDURAL HISTORY**

The litigation of this dispute began September 1, 2010, when Clarendon commenced an action in New York (the "NY Action") against RAC and its principal shareholders, Luis Alvarez ("Alvarez") and Enrique Cuadra ("Cuadra"), to recover excess commission in the amount of $540,123.14 owed by RAC to Clarendon (the "Excess Commission") pursuant to the General Agency Agreement entered into by RAC and Clarendon effective April 1, 2003 (the "Agency Agreement").[1] Alvarez and Cuadra are also individually liable to Clarendon for the Excess Commission under the Guarantee they executed, which forms Schedule 3 of the Agency Agreement. (Cuadra Decl. ¶ 5; Declaration of Luis Alvarez in Support of Plaintiff's Motion for Summary Judgment ("Alvarez Decl.") ¶ 4.)

The NY Action, *Clarendon National Insurance Company v. RAC Insurance Partners, LLC, et al.* (Index No. 651429/10), was commenced in New York State Supreme Court, New York County, and was removed by the three defendants (collectively, the "NY Defendants"), on October 20, 2010, to the U.S. District Court for the Southern District of New York (Case No. 10 CV 7993 (RMB)), where it is now pending.[2] On November 19, 2010, the NY Defendants filed their answer to the NY Complaint (the "NY Answer").[3] In their Answer, the NY Defendants did not contest the factual allegations of the NY Complaint with respect to the Agency Agreement or the commission payable thereunder. They maintained, however, and asserted as an affirmative defense, that Clarendon's claim for the Excess Commission was effectively released by

---

[1] A copy of the Agency Agreement is attached to the Declaration of Enrique Cuadra in Support of Plaintiff's Motion for Summary Judgment (the "Cuadra Decl.") as Exhibit A.

[2] A copy of the complaint and accompanying exhibits (the "NY Complaint") is attached to Clarendon's Answer in this proceeding as Exhibit A. The NY Defendants' Notice of Removal is attached to the Affidavit of Adam Russ in Opposition to Plaintiff's Motion for Summary Judgment (the "Russ Affid."), accompanying this Memorandum of Law, as Exhibit B.

[3] A copy of the NY Answer is attached to the Russ Affid. as Exhibit C.

Clarendon under the terms of a Settlement Agreement and Release (the "Settlement Agreement") entered into by RAC, Clarendon and three other parties in 2008.[4]

On November 18, 2010, RAC commenced the instant action, alleging that Clarendon's demand for the Excess Commission constitutes a breach of the Settlement Agreement, and requesting not only a declaratory judgment to that effect, but also a declaration ordering that "the terms of the Settlement Agreement supercede [sic] and novate the terms of the Agency Agreement to the extent set forth in the Settlement Agreement." (Complaint at p.10, par. 2(c) of the WHEREAS clause (Demand for Relief).)

On January 13, 2011, Clarendon filed its Answer in the instant case, denying that its claim for Excess Commission had been released under the Settlement Agreement, and arguing that: (i) this Court lacks, or should decline to exercise, subject matter jurisdiction to adjudicate Clarendon's claim for Excess Commission based upon the Agency Agreement's mandatory, exclusive forum selection clause requiring all disputes relating to the Agency Agreement to be brought in New York;[5] and (ii) RAC's contentions with respect to the Settlement Agreement were properly asserted, and had already been asserted, as an affirmative defense in the New York Action, where they would duly be adjudicated under Florida law, rather than as a separate action in Florida.

The NY Defendants filed a Motion to Stay the NY Action on March 14, 2011. Clarendon filed a Motion for Preliminary Injunction Enjoining Defendant RAC from Prosecuting its Second-Filed Action in Florida (*i.e.*, the instant action) on April 4, 2011. Both motions are pending before the Honorable Richard M. Berman, U.S. District Judge for the Southern District of New York. Clarendon had previously filed with this Court, on March 11, 2011, its Motion to Stay This Action Pending the New York Court's Determination of its Motion to Enjoin RAC.[6]

---

[4] A copy of the Settlement Agreement is attached to the Cuadra Decl. as Exhibit B.

[5] Agency Agreement, § 9.6.

[6] Clarendon's submission of this Opposition to RAC's motion for summary judgment should not be deemed a waiver of its claim that this Court should decline to exercise subject matter jurisdiction over this case based upon both the forum selection clause and the first-filed rule.

## THE FACTS

**A.      The Dual Factual and Legal Relationship between Clarendon and RAC**

The narrative of this dispute begins April 1, 2003, when Clarendon and RAC entered into not one, but two agreements. The first, the Agency Agreement, governed the relationship between Clarendon as insurer-principal, and RAC as its general agent. The second, the Claims Administration Agreement,[7] governed the relationship between Clarendon as insurer and RAC as its claims administrator.[8]

The two capacities – general agent and claims administrator – are wholly separate and distinct from one another, both functionally and legally, involving as they do entirely different operations, personnel, compensation, sources of funds, record-keeping and reporting, and governed, as they are, by separate legal agreements. Pursuant to the Agency Agreement, RAC serves as Clarendon's underwriter, and as such is responsible for functions at the 'front-end' of the business: producing the business written by Clarendon (*i.e.*, finding and selecting the insureds to purchase Clarendon policies) and then issuing, collecting the premium for, and administering those policies. In contrast, as claims administrator, RAC is involved solely with the 'back-end' of the business, receiving, recording, investigating, adjusting and settling the claims filed by the program's insureds.

In most, although not all, cases, Clarendon contracts with two different entities to provide the policy administration and claims administration services for a given program. With respect to the insurance program at issue here, a program of private passenger automobile coverage, the legal entity known as RAC separately contracted with Clarendon to perform: (i) policy administration services under the Agency Agreement; and (ii) claims administration services under the Claims Administration Agreement.

The essential point, however, whether one or two entities provide these distinct services, is that the legal agreements embodying and governing the two functions, as well as the functions themselves – including the flow and disposition of different streams of funds, the daily

---

[7]     The Claims Administration Agreement is attached to the Affidavit of Barry Stinson in Opposition to Plaintiff's Motion for Summary Judgment (the "Stinson Affid.") as Exhibit A.

[8]     Clarendon is a "program insurer," which means that it contracts with other parties who perform, as Clarendon's agent, certain key insurance functions, most notably policy administration and claims administration.

administration of policies on the one hand and claims on the other, the reporting and data collection relating to such administration, and the management of all of the foregoing – are necessarily strictly segregated in accordance with applicable audit principles and requirements, industry standards and practice, and practical necessity. Thus, agents involved with selling, issuing and administering policies are not ordinarily permitted to have anything to do with the administration of claims arising under those policies, and *vice versa*.

Evidencing this strict legal and functional division between the two categories of services, the Agency Agreement and its Addenda are all executed on behalf of RAC by Alvarez, the managing partner of RAC in charge of policy issuance and administration (Cuadra Decl., Exh. A, D.E. 22-1, pp. 12 of 84; 39 of 84; 52 of 84; 54 of 84; 56 of 84; 61 of 84; and 63 of 84), whereas the Claims Administration Agreement and its Addendum are both executed by Cuadra, the managing partner of RAC in charge of claims administration. (Stinson Affid., Exh. B). Similarly, Clarendon's communications with RAC with respect to policy administration under the Agency Agreement, including the calculation of Adjusted Commission and the Excess Commission due, were conducted with Alvarez, a fact confirmed by the e-mails and correspondence offered by RAC in support of its motion. (Sheehan Affid. ¶ 8; Alvarez Decl., Exh. A). Clarendon's dealings with RAC with respect to claims administration, on the other hand, were with Cuadra. (Stinson Affid. ¶ 4; Sheehan Affid. ¶ 8 ). Finally, consistent with the separate legal rights and obligations, functions and operations discussed above, Clarendon has conducted separate audits of the discrete policy administration and claims administrations services performed by RAC, just as it would were the functions performed by different entities. (Sheehan Affid. ¶ 8 ).

B.     **The Agency Agreement and the Excess Commission Due Thereunder**

Under the Agency Agreement, as outlined above, RAC is authorized and obliged to issue policies on behalf of Clarendon, collect the premium due on those policies, amend the policies and endorsements as necessary (for example, to add, delete or substitute a covered vehicle or driver), administer and maintain the bank accounts established by Clarendon for the deposit of premium funds, and produce and maintain premium, policy and financial registers and reports in formats prescribed by Clarendon. In return for the performance of its services as policy administrator, RAC is entitled to an initial commission equal to a specified percentage of the premium it collects (the "Provisional Commission"). The Provisional Commission is subject to

annual upward or downward adjustment, based upon the profitability of the business. The amount by which the Provisional Commission is either increased or decreased at each annual accounting date is referred to as the Adjusted Commission.

The profitability of the business is determined as of April 30th of each year (the "Adjustment Date"), by calculating the ratio of all losses and expenses incurred under the program policies to the total premium collected for the program policies. (Sheehan Affid. ¶ 10). The ratio of total losses and expenses to total premiums is called the "loss ratio," and the commission RAC is entitled to is readjusted each year on the basis of a sliding scale of commission rates keyed to the actual loss ratio for all of the program policies as of the Adjustment Date. (*Id*). The sliding scale of commission rates is set forth in Schedule C of the Agency Agreement, as amended by various Addenda. If the amount of commission previously paid to RAC is less than the amount it is due as of the most recent Adjustment Date, RAC is entitled to receive the difference. If the amount RAC has previously received is greater than the amount due as of the Adjustment Date, RAC is obliged to return the difference, referred to herein as Excess Commission. (*Id*). The purpose and result of this business arrangement is to effectuate a sharing among the reinsurers, the insurer (Clarendon), and the general agent (RAC) of the program's overall profitability. (*Id*).

The calculation of Adjusted Commission as of April 30, 2009, resulted in Excess Commission due from RAC in the amount of $573,891.71, of which RAC eventually paid just $33,768.57, leaving Excess Commission of $540,123.14 as of that date currently due and owing.[9] (Sheehan Affid. ¶ 11).

C.      **The Claims Administration Agreement**

As outlined above, under the Claims Administration Agreement, RAC is authorized and obligated to perform a wholly different set of services from those set forth in the Agency Agreement – namely to receive, examine, report, document, and investigate all claims filed under the program policies, and to adjust and settle those claims that Clarendon is obligated to pay. (Sheehan Affid. ¶ 12-13). In return for its claims administration services, RAC is entitled to fees as specified in Article 3 and Exhibit A of the Claims Administration Agreement. These

---

[9]     Due to further deterioration in the program business, additional amounts of Excess Commission are due from RAC as of April 30, 2010 and up to the present.

*fees* are entirely separate from and in addition to the *commission* paid to RAC under the Agency Agreement. (*Id*). The separate and distinct nature of RAC's capacities as claims administrator and general agent is evidenced by the separate identification of RAC in each capacity on the Declarations page of the Claims Administration Agreement. (Sheehan Affid. ¶13; Stinson Affid., Exh. A, p. 2).

**D.      The Cuquejo Claim and the Settlement Agreement**

One of the many claims arising under the program policies involved an accident in November 2004 between a Clarendon insured, Mr. Olortegui, and a grievously-injured third party, Mr. Cuquejo. Mr. Olortegui was sued by Mr. Cuquejo's guardian. Mr. Olortegui filed a claim (the "Cuquejo Claim") with RAC, as Clarendon's claims administrator, and subsequently a bad faith claim was threatened against Clarendon, alleging improper administration of the Cuquejo Claim. (Sheehan Affid. ¶ 14). Clarendon in turn sought recovery from RAC as claims administrator under the Claims Administration Agreement. (*Id*).

In February 2008, RAC, Clarendon and their respective errors and omissions ("E&O") insurers -- Lexington Insurance Company, RAC's E&O insurer ("Lexington"), Columbia Casualty Company, Clarendon's primary layer E&O insurer ("CCC") and Illinois Union Insurance Company, Clarendon's excess E&O insurer ("Illinois Union") – entered into a Settlement Agreement and Release (the "Settlement Agreement"). Under the terms of the Settlement Agreement, Lexington agreed to contribute $2 million to the $12.5 million settlement of the Cuquejo Claim. (Cuadra Decl., Exh. B, par.1). CCC, Clarendon's primary E&O insurer, contributed $9.2 million, and Clarendon paid the remaining $1.3 million from its own pocket. (Jack Affid., Exh. A (email from Scott Newman, dated January 15, 2008). RAC itself contributed no funds to the settlement. (Jack Affid. ¶ 8 and Exh. A). In consideration of Lexington's contribution of $2 million, Clarendon, CCC and Illinois Union agreed to release any and all claims they had or might have had against RAC and/or Lexington as a result of RAC's administration of the Cuquejo claim.

In keeping with the separation and distinction between claims administration and policy administration functions discussed above, the Settlement Agreement was executed on behalf of RAC by Cuadra.

**E.      Clarendon's Claim for Excess Commission under the Agency Agreement**

7

In calculating RAC's Adjusted Commission as of April 30, 2009, Clarendon, as a matter of course, included the $1.3 million of net loss that was incurred for the Cuquejo Claim. This is in complete accord with the methodology for determining Adjusted Commission set forth in the Agency Agreement. The losses includible in the calculation of Adjusted Commission are expressly defined to include extra-contractual losses and losses in excess of policy limits such as the Cuquejo losses. (Sheehan Affid. ¶17 ; Agency Agreement, Schedule C, Article 3; Reinsurance Agreement, pp. 7, 8 and 12-13.[10])

RAC contends that the effect of the Settlement Agreement is somehow to extinguish Clarendon's right to include the Cuquejo losses in the calculation of Adjusted Commission under the Agency Agreement. However, as discussed in detail below, the Settlement Agreement contains *absolutely no mention of the Agency Agreement or of any potential future claim for Excess Commission thereunder*. Rather, it explicitly refers solely to Clarendon, CCC and Illinois Union's release of claims relating to *RAC's administration of the Cuquejo Claim under the Claims Administration Agreement.* Thus the released claims are all predicated upon fault, whether framed as breach of contract, negligence, professional liability, bad faith, or otherwise. As such, they are wholly distinguishable from and unrelated to RAC's purely contractual agreement to remit Excess Commission, if and when due, under the Agency Agreement – an obligation in no way premised upon fault or wrong-doing of any kind. (Sheehan Affid. ¶¶ 18-19).

Indeed, the inclusion of the net cost of the Cuquejo Claim in the calculation of Adjusted Commission under the Agency Agreement is a purely factual, mathematical, no-fault recognition of one component of total policy losses to be proportionately shared, as provided by the Agency Agreement, among the reinsurers, Clarendon and RAC. (Sheehan Affid. ¶20). As such, it is simply the business deal agreed to by the parties to the Agency Agreement. (*Id*). Correlating the general agent's ultimate commission to the profitability of the insurance program is a standard business arrangement – an arrangement that recognizes the general agent's responsibility as the 'producer' of the business and provides the agent with as much opportunity for reward as for risk. (*Id*). Under such an arrangement, and as expressly provided in the Agency Agreement, the

---

[10] The Reinsurance Agreement is attached as Exh. B to the NY Complaint, which is attached as Exh. A to Clarendon's Answer in the instant case.

general agent agrees in effect to follow the fortunes of the insurer and reinsurers by reaping the rewards and assuming the risks inherent in, among other things, the losses and expenses associated with claims. (*Id*).

As further detailed below, it was never the intention of the parties to the Settlement Agreement to amend the terms of the Agency Agreement, or to modify RAC's rights or obligations with respect to commission thereunder. (Sheehan Affid. ¶ 21). If such a suggestion had ever been made, Clarendon would have rejected it, since it would have meant forfeiting claims that had not yet accrued and whose amount could not be foreseen. (*Id*). No consideration flowed, or could have flowed, to Clarendon under the Settlement Agreement to induce such forfeiture. (Sheehan Affid. ¶ 22). As stated above, the only consideration provided for Clarendon's (and its E&O insurers') release was the proceeds of the Lexington E&O policy. That policy expressly excludes *"any Claim ... based on or arising out of the actual or alleged failure to ... return to anybody any ...commission ...."* (Russ Affid., Exh. E, (Lexington E&O policy, Exclusion M, p. 6 of 11.)

The effect of excluding the net costs of the Cuquejo Claim from the adjusted commission calculation would be to retroactively wave a wand and pretend that these losses were never incurred, and that no sharing of them among Clarendon, the reinsurers and RAC is to be effected. (Sheehan Affid. ¶ 23). Not only would this flatly contradict the express terms of the Agency Agreement and the Reinsurance Agreement; it would also render the resulting calculation of the program's profitability a fiction and serve to unjustly enrich RAC.[11] (*Id*).

F.      **Factual Defects of RAC'S Motion**

In support of its motion for summary judgment, RAC argues – as it must – that no material question of fact is at issue in this dispute. Nothing could be further from the truth. Indeed, RAC has submitted factual affidavits in support of its motion replete with material factual claims vigorously disputed by Clarendon regarding both the calculation and amount of commission due from RAC under the Agency Agreement (*see, e.g*., Alvarez Decl. ¶¶ 8, 10, 15,

---

[11]     Among the many material facts at issue is how the Cuquejo Claim costs were to be filtered out of the Adjusted Commission calculation, assuming the parties intended to do so. The absence of any Addendum to the Agency Agreement setting forth how this is to be done is only more evidence of the fact that there was never any such intention. *See* Clarendon's Statement of Disputed and Undisputed Facts and discussion *infra*.

16 and 17) and the intent, scope, factual predicates and meaning of the Settlement Agreement (*see e.g.*, Cuadra Decl. ¶¶ 9, 11, 21, 23 and 29.[12]) These fact questions alone defeat RAC's motion.

Moreover, the core material facts, no matter how much RAC may seek to gloss over or obscure them, simply cannot be ignored or erased. The nub of RAC's case is succinctly set forth in its Motion for Summary Judgment and Incorporated Memorandum of Law ("MOL") as follows:

> Clarendon asserts that the Settlement Agreement only releases claims attributable to RAC's errors and omissions claims ("E&O claims"). (SOF ¶ 18). This argument fails for two reasons: (i) the Settlement Agreement is unambiguous that the scope of the release encompasses more than E&O claims, and (ii) Clarendon could have, but failed to, preserve any claims attributable to the Cuquejo Claim against RAC, or Cuadra or Alvarez as guarantors under the Agency Agreement.

(RAC MOL, p.10.)

In stark contrast to both prongs of RAC's claim, however, we know definitively, from the contemporaneous email sent by Lexington's counsel, Scott Newman, to the counsel for the four other parties to the Settlement Agreement -- including RAC's counsel, Francisco R. Angones (Cuadra Decl., ¶24) -- that the claims released were *precisely* limited to the "E&O claims." (Sheehan Affid. ¶ 27). Mr. Newman stated:

> Gentleman – While a formal letter is being prepared, please accept this email in follow up to our earlier conversations. On behalf of Lexington, please allow this to confirm the resolution of *the potential E&O claims by Clarendon, Columbia Casualty and Illinois Union against Lexington's insured, RAC Partners, LLC*. (Jack Affid. ¶16, Exh. B; emphasis added.)

RAC's counsel, Mr. Angones, raised no objection to this limitation. Clarendon's counsel, Mr. Jack, affirmed Mr. Newman's statement in his reply and in addition stated: "Scott: Thanks. *No questions here. The release by Clarendon in favor of RAC should be limited to this specific Cuquello [sic] case.* Lew." (Jack Affid. ¶17 , Exh. C; emphasis added.)

It is thus clear beyond cavil not only that the Settlement Agreement most certainly limits the claims released to the E&O claims, but also that: (i) the parties expressly signaled their

---

[12] For Clarendon's opposing view of these material factual questions, *see* its Statement of Material Facts in Dispute and Additional Undisputed Material Facts in Opposition to Plaintiff's Motion for Summary Judgment ("SOMFID").

recognition of, and consent to, this limitation and (ii) Clarendon in fact expressly reserved its rights with respect to all claims other than the specific Cuquejo E&O claims. Thus the two essential prongs of RAC's case are both without merit and its motion must accordingly fail.

Moreover, we know that there could have been no consideration provided for Clarendon's release of its commission claims under the Agency Agreement because: (i) RAC itself provided no consideration at all for Clarendon's release (Jack Affid. ¶ 8) and (ii) the consideration provided by Lexington could not possibly have related to Clarendon's commission claims under the Agency Agreement because the Lexington E&O policy expressly excludes *"any Claim ... based on or arising out of the actual or alleged failure to ... return to anybody any ...commission ...."* (Russ Affid., Exh. E (Lexington E&O Policy), Exclusion M, p. 6 of 11; emphasis added.)

And if this all were not enough, we have RAC's own contemporaneous admission that the Settlement Agreement had no effect whatever upon the commission due under the Agency Agreement. Addendum No. 5 of the Agency Agreement, which revises the initial and sliding scale commission rates to be applied, was signed by Mr. Alvarez on behalf of RAC *just two weeks after the Settlement Agreement was executed*. (Cuadra Decl., Exh. A, D.E. 22-1 pp. 62-63 of 84; Cuadra Decl., Exh. B, pp. 6 and 7.) In the Addendum, Mr. Alvarez agreed on behalf of RAC that apart from the revised rates set forth in Addendum No. 5, "[t]he parties wish to … otherwise ratify their obligations under the Agreement." Addendum No. 5 makes no mention of the Cuquejo Claim and makes no amendment to adjusted commission due based upon the Cuquejo Claim or the Settlement Agreement. Accordingly, RAC has itself ratified the validity of Clarendon's claim for the Excess Commission.

## THE LAW

**A.  The Legal Standard for Summary Judgment**

Summary judgment is appropriate only where it is shown that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986); *Midland Management, LLC v. Burger King Corporation*, 217 F.Supp.2d 1261, 1263-64 (S.D.Fla. 2001). The moving party has the burden of meeting this "exacting standard." *Zapata Industries, Inc. v. W.R. Grace & Co.-Conn.*, 1999 WL 33268643 (S.D.Fla. 1999) at *4; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-

09 (1970. The criteria to be used by in applying this standard have been set forth by the Eleventh Circuit in *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir.1982), as follows:

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. (As quoted in *Zapata, sup*ra at *4; citations omitted.)

*See also Amey, Inc. v. Gulf Abstract & Title, Inc*. 758 F.2d 1486 (11th Cir.1985), *cert. denied*, 475 U.S. 1107 (1986). If the movant succeeds in meeting its initial burden, the nonmoving party must come forward with sufficient evidence of every element he or she must prove." *Celotex Corp*., 477 U.S. at 322; *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987). However, Rule 56(c) only authorizes entry of summary judgment against a nonmoving party who has had "adequate time for discovery." *Celotex Corp., supra* at 322.

B. **Construing the Settlement Agreement: The Scope of Claims Released**

1. **The Text of the Settlement Agreement and the Rules of Interpretation**

Releases are a form of contract and therefore must be interpreted and construed in accordance with principles of contract law. *Allapattah Services, Inc. v. Exxon Corporation*, 188 F.R.D. 667, 682 (S.D.Fla. 1999). The issue in this case is the proper interpretation of the Settlement Agreement with respect to the scope of the Clarendon release. The central precept of contractual interpretation is that effect must be given to every word, term and phrase of the contract without rendering any of them meaningless or superfluous. *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F.Supp.2d 1342, 1358; *In re: Petition of the MS "Medeleine" Schiffahrtsgesellschaft mbH & Co., KG*, Case Number 08-61757-CIV-Moreno, 2010 U.S. Dist. LEXIS 14950 , at *9 (S.D. Fla., Feb. 19, 2010). In addition, "[e]ach provision of the contract must be read in light of the others so as to give the meaning reflected by the contract as a whole." *Cashman Equip. Corp*., 2007 WL 934537, at *2, as quoted in *F.W.F., Inc*., 494 F.Supp. at 1358. As stated by the U.S. Supreme Court:

> The elementary canon of interpretation is, not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the obligations between the parties, and the intention

which they have manifested in forming them." *O'Brien v. Miller*, 168 U.S. 287, 297 (1897), as quoted in *F.W.F., Inc*., 494 R.Supp.2d at 1357.

The fatal defect of RAC's reading of the Settlement Agreement is that it ignores whole clauses of the Agreement's text, thus rendering them meaningless and superfluous. In doing so, RAC effectively re-writes the Settlement Agreement *ex post facto*, erasing the explicit limitations the agreement contains, and substituting instead, by implication, a broader reading of its own manufacture, ungrounded in the text.

The scope of the Settlement Agreement is set forth in the First through the Fourth WHEREAS clauses. They read in their entirety as follows:

> WHEREAS, Marlene Cuquejo, as plenary guardian of the person and property of Alfredo Severino Cuquejo, Jr., filed a lawsuit in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, against Ciro Ergasto Olortegui, as a result of an automobile accident that occurred on or about November 14, 2004; and
>
> WHEREAS, Ciro Olortegui was insured under a policy of automobile liability insurance with Clarendon, which had an agreement with RAC whereby RAC would adjust claims and suits against Clarendon insureds, such as the lawsuit filed by Marlene Cuquejo against Ciro Olortegui; and
>
> WHEREAS, the events related to the lawsuit filed by Marlene Cuquejo against Ciro Olortegui gave rise to a purported bad faith claim by Olortegui against Clarendon which, in turn, gave rise to a purported errors and omissions claim by Clarendon, Columbia and Illinois Union against RAC and its insurer, Lexington; and
>
> WHEREAS, Lexington, RAC, Clarendon, Columbia and Illinois Union wish to settle and resolve completel all claims and disputes which Clarendon, Columbia and Illinos Union have or may have had against RAC and/or Lexington as a result of the circumstances and events described above.

Thus, the first three WHEREAS clauses set forth, respectively, the particulars regarding: (i) the lawsuit filed by Cuquejo against Olortegui; (ii) the policy contract between Olortegui and Clarendon, and the Claims Administration Agreement between Clarendon and RAC; and (iii) the bad faith claim by Olortegui against Clarendon, and the E&O claim by Clarendon and its E&O insurers against RAC. The Fourth WHEREAS clause, which sets forth the purpose and parameters of the Settlement Agreement, expressly limits the claims and disputes to be settled and resolved to those that Clarendon and its E&O insurers "have or may have had against RAC

and/or Lexington *as a result of the circumstances and events described above*." Nowhere above (or below) is there any mention of the Agency Agreement or RAC's wholly distinct, severable relationship to Clarendon as policy administrator under the Agency Agreement, or of Clarendon and RAC's rights and obligations with respect to adjusted commission thereunder. The only actual or potential Clarendon claims to which the Settlement Agreement makes reference are those arising under the Claims Administration Agreement.

It is important in this regard to note the strict parallelism between the Second and Third Whereas clauses: The Second sets forth the legal contracts and relationships between, on the one hand, Olortegui and Clarendon, and, on the other, Clarendon and RAC (*viz.*, Clarendon's policy contract with its insured and Clarendon's Claims Administration Agreement with RAC). The Third mirrors the Second exactly by describing the bad faith claims of Olortegui against Clarendon, arising from the policy, and Clarendon's "errors and omissions claim" against RAC, arising under the Claims Administration Agreement.

Remarkably, nowhere in any of RAC's submissions to this court, including its motion, does it ever mention, let alone set forth or discuss, the Second and Third WHEREAS clauses. In its "Statement of Undisputed Facts," moreover, RAC not only ignores these clauses entirely, but inserts within brackets language of its own that, in light of these omissions, is misleading.

Yet the importance and effect of these clauses' limitations cannot be doubted. Paragraph 11 provides that "[t]he terms of this Settlement Agreement and Release, and all provisions set forth herein, are contractual and not merely a recital." To be sure, if there had been any intention on the part of the parties to the Settlement Agreement to include claims arising under the Agency Agreement, it would have been a simple matter to say so.

In accordance with the limitations discussed above, paragraph 2 of the Settlement Agreement defines the claims released by Clarendon as those

> which *have been, could have been, or might have been asserted as a result of the events related to or concerning the automobile accident that occurred on November 14, 2004*, including, but not limited to, any all claims specifically related to *allegations of improper claim handling, professional liability or bad faith on the part of RAC Insurance Partners, LLC*. (Emphasis added.)

Again, the only explicit reference is to improper claim handling, professional liability or bad faith under the Claims Administration Agreement. The commission calculation under the Agency Agreement has nothing whatsoever to do with improper claims handling, professional

liability or bad faith. While it is true that this paragraph contains the standard "including, but not limited to" phrase, that phrase cannot be read – as RAC seeks to do -- to nullify the equally important limiting language in the same clause, as well as in the WHEREAS clauses. The simple fact is that Clarendon's claim for Excess Commission under the Agency Agreement neither had been, could have been or might have been asserted as a result of the Cuquejo accident (*see* italicized text in par. 2, above), because the Excess Commission claim did not, and could not possibly, accrue until at least April 30th, 2009 – *i.e.*, after the Settlement Agreement had been executed. If there had been the slightest intention to include a potential future claim for adjusted commission under the Agency Agreement, the language of this paragraph would have had to be worded very differently and the Agency Agreement and adjusted commission due thereunder would have had to have been expressly referenced.

Similarly, paragraph 3 also discharges RAC from all liability to Clarendon "with respect to the lawsuit filed by Marlene Cuquejo and/or the potential bad faith claim by [Olortegui] against Clarendon and its insurers." Neither the lawsuit filed by Marlene Cuquejo against Olortegui, nor the bad faith claim of Olortegui against Clarendon, has anything whatever to do with RAC's obligations, or Clarendon's rights, with respect to commission earned under the Agency Agreement. Paragraph 3 further declares the intention of the parties

> to extinguish any potential liability on the part of RAC … for contribution, indemnity, subrogation, equitable subrogation, and/or proration, including, but not limited to, both defense and indemnity, which might be claimed against RAC … by Clarendon … *for the matters released hereinabove*. (Emphasis added.)

As already detailed, "the matters released hereinabove" do not include any claim relating to adjusted commission under the Agency Agreement.

Finally, paragraph 11 provides that "[t]his document contains the entire agreement between the parties *with respect to the subject matter hereof* and supersedes all prior discussions, agreements and understandings, both oral and written among the parties *with respect thereto*." (Emphasis added.) As stated above "the subject matter hereof" does not include any claim relating to adjusted commission under the Agency Agreement.

Clarendon is in perfect agreement with RAC (and with the text of paragraphs 2 and 3 of the Settlement Agreement) that, *with respect to Clarendon's E&O claims against RAC*, the release is broad indeed and encompasses virtually any form of recovery that could arise from RAC's faulty provision of services under the Claims Administration Agreement – including

claims for breach of contract, negligence, bad faith, indemnity (the Claims Administration Agreement contains indemnification provisions), subrogation, etc. However, Clarendon vigorously denies – and there is no evidence in the text of the Settlement Agreement to suggest – that Clarendon released its purely contractual (non-fault-based) claim to Excess Commission under the *Agency Agreement*.

   Florida's law governing the construction of releases supports Clarendon's contentions. Specific recitals in a release will generally be held to govern, and thereby restrict, the scope of general language set forth thereafter. *Florida Evergreen Foliage v. E.I. Dupont de Nemours and Company*, 336 F.Supp.2d 1239, 1294-96 (S.D. Fla. 2004); 29 Williston on Contracts § 73:7; 73:9 (4th ed.). Where an agreement contains a broad release of claims that is qualified elsewhere in the agreement, the scope of the release will be read narrowly in accordance with the limiting language. *Mazzoni Farms, Inc. v. E.I. DuPont de Nemours and Co.*, 761 So.2d 306, 315 (S.Ct.Fla. 2000); *Owens v. Nationwide Mutual Insurance Co.*, 884 So.2d 249, 251 (Fla. 2nd D.C.A. 2004). Moreover, if the asserted claim is of a different kind or nature than the released claim(s), and/or arises under either a different contract than the released claim or under an ongoing provision of the same contract, the release will not bar the asserted claim. *Owens*, 884 So.2d at 251. Thus, in *Midland Management v. Burger King Corporation*, 217 F.Supp.2d 1261, 1265 (S.D. Fla. 2001), the plaintiff maintained that the settlement agreement in question released any claim defendant had against it for any breach of a franchise agreement. The court, rejecting plaintiff's broad interpretation of the settlement agreement, found that the settlement agreement had been entered into by the parties as a resolution of a specific civil action relating to plaintiff's failure to make lighting repairs in breach of the franchise agreement, and that the settlement agreement could not therefore be held to have altered the franchise agreement with respect to a different subject – *viz.*, the terms and conditions for renewal. In the instant case, Clarendon's claim for Excess Commission is not only of a different kind from the claims released under the Settlement Agreement; it also arises under a wholly separate contract.

   Finally, even a broad, general release only releases claims that had matured at the time of the release's execution, and will not bar a claim that had not yet accrued when the release was executed. *Hold v. Manzini*, 736 So.2d 138, 141 (Fla. 3d D.C.A 1999); *Scheck v. Burger King Corp.*, 756 F.Supp 543, 547 (S.D.Fla. 1991); *Sottile v. Gaines Constr. Co.*, 281 So.2d 558, 561 (Fla. 3d D.C.A. 1973). In the instant case, the Settlement Agreement's release is expressly

limited to claims of Clarendon that "have been, could have been, or might have been asserted" as a result of the Cuquejo accident and the Olortegui bad faith claim. Clarendon's claim for Excess Commission, in contrast, is based upon the losses and expenses incurred, and the premiums received, under *all* program policies as of April 30, 2009, and accordingly could not accrue until at least April 30, 2009. Such future claims are not released under even the broadest general release. *Gulf Croup Holdings, Inc. v. Coast Asset Management Corporation*, 516 F.Supp.2d 1253, 1268 (S.D.Fla. 2007); *Owens*, 884 So.2d at 251.

In sum, Clarendon's interpretation of the Settlement Agreement gives full meaning to every word, phrase and clause of the Settlement Agreement, without reading any additional terms into it by implication. RAC's interpretation on the other hand can only be accepted if whole clauses are ignored and rendered mere surplusage, and additional terms are added by implication.

    **2.** **The text of the Settlement Agreement and the Parties' Differing Interpretations as to its Meaning Preclude Summary Judgment in this Case**

Construction of a contract is a question of law for the trial court only where the terms used are unequivocal, clear, undisputed, and not subject to conflicting inferences. *Campaniello v. Amici Partnership*, 832 So.2d 870 (Fla. 4th DCA 2003); *Langner v. Charles A. Binger, Inc.*, 503 So.2d 1362, 1363-64 (Fla. 3d DCA 1987) and cases there cited. However, as stated by the *Campaniello* court, "…when the terms of a written instrument are disputed and rationally susceptible to more than one construction, an issue of fact is presented which cannot properly be resolved by summary judgment." *Id.; see also, Birwelco-Montenay, Inc. v. Infilco Degrement, Inc.*, 827 So.2d 255 (Fla.3d DCA 2001). Moreover, where, as here, each side argues that the contract is clear and unambiguous, but ascribes a different meaning to the "unambiguous" instrument, the contract is rendered ambiguous and summary judgment is improper. *Killearn Homes Association, Inc. v. Visconti Family Limited Partnership*, 21 So.3d 51 (Fla. 1st DCA 2009); *Campaniello*, 832 So.2d at 870; *Birwelco-Montenay*, 827 S0.2d at 257.

When contractual language is found ambiguous, it is appropriate for the court to consider extrinsic evidence to ascertain the intent of the parties (*Emerald Pointe Property Owners Association, Inc. v. Commercial Construction Industries, Inc*., 978 So.2d 873, 877 (Fla. 4th DCA 2008); *Okeechobee Landfill, Inc. v. Republic Servs. of Fla., Ltd. P'ship*, 931 So.2d 942, 945 (Fla. 4th DCA 2006); *Killearn*, 21 So.3d at 52-53), including evidence regarding standard practices in

the business or industry in question, as well as the parties' previous dealings. *Emerald Pointe*, 978 So.2d at 878.

Accordingly, under the facts and law that are operative here, the Court may at this juncture grant summary judgment to Clarendon, independent of the motion, pursuant to F.R.Civ.P. 56(f)(1) for the reasons set forth above, or, alternatively, find that the Settlement Agreement is ambiguous, and thus that summary judgment for either party at this time is precluded. It must in any event deny RAC's motion, given the material questions of fact raised by Clarendon, and the parties' disagreement as to the "unambiguous" meaning of the Settlement Agreement.

C.     **RAC's Motion is Premature**

RAC's motion for summary judgment at this juncture -- when discovery has just begun, document production has not been completed, and no depositions have been conducted -- begs the question: Why the rush? The close of discovery has been fixed by the Court for April 22, 2011 – a mere nine days after RAC's Reply to this Opposition is due. Although it may well turn out to be the case that this matter can properly be decided by means of summary judgment, it is surely inappropriate to rush to judgment before the parties have even been able to gather, ascertain and evaluate the relevant evidence. As noted above, the grant of summary judgment under Rule 56 is inappropriate if the nonmoving party has had an inadequate opportunity to conduct discovery.

Clarendon has set depositions of several of Plaintiff's representatives for April 18, 19, and 20th, in Miami, FL. Notably, the Plaintiff has not filed any Motion for Protective Order limiting such discovery.

In Florida, summary judgment should not be granted until the facts have been sufficiently developed for the court to be reasonably certain that no genuine issue of material fact exists. *Singer v. Star,* 510 So.2d 637, 639 (Fla. 4th DCA 1987). As a general rule, a court should not enter summary judgment when the opposing party has not completed discovery. *Colby v. Ellis,* 562 So.2d 356 (Fla. 2d DCA 1990).

Similarly, District courts should not grant summary judgment until the non-movant "has had an adequate opportunity for discovery." *Snook v. Trust Co. of Ga. Bank,* 859 F.2d 865, 870 (11th Cir.1988); *see also McCallum v. City of Athens,* 976 F.2d 649, 650 (11th Cir.1992) (noting that a party may move for summary judgment only after exchanging "appropriate" discovery).

Thus, out of fairness to the non-movant, "summary judgment may only be decided upon an adequate record." *WSB-TV v. Lee,* 842 F.2d 1266, 1269 (11th Cir.1988). A district court may grant summary judgment in the early stages of discovery only if "further discovery would be pointless" and the movant is "clearly entitled to summary judgment." *Robak v. Abbott Labs.,* 797 F.Supp. 475, 476 (D.Md.1992); *see also Lock Realty Corp. IV v. Regal Gen. Contractors, Inc.*, 2006 WL 752830 (M.D.Fla. 2006) (summary judgment denied as premature when filed prior to the deadline for dispositive motions in the Court's scheduling Order and discovery was on-going).

Further, it is reversible error for Courts to enter summary judgment when depositions are pending. See *UFF DAA, Inc. v. Towne Realty, Inc.,* 666 So.2d 199 (Fla. 5th DCA 1995) (reversible error to enter summary judgment when discovery is in progress and the deposition of a party is pending*); see Lubarsky v. Sweden House Properties of Boca Raton, Inc***,* 673 So.2d 975 (Fla. 4th DCA 1996) (reversible error for the court to enter summary judgment six months after suit was filed with depositions pending); *see also Sanchez v. Sears Roebuck and Co*., 807 So.2d 196, (Fla. 3d DCA 2002).

Here, Clarendon has set several depositions for the upcoming weeks within the discovery period as previously set forth in the Court's scheduling Order. The upcoming depositions will likely produce testimony that would be relevant for the trier of fact to determine the issues in this lawsuit. Furthermore, there would be no harm or prejudice to any party if this Court permitted the upcoming depositions and discovery to proceed before ruling on summary judgment, as Plaintiff has not objected to the depositions. If the depositions were permitted to go forward, the Court could then make its determination regarding whether to consider parol evidence after being fully apprised of the deposition testimony of the respective parties in the case. On the other hand, if the Court entered a ruling adverse to Clarendon on the Motion for Summary Judgment prior to the depositions' going forward, such an Order could be reversed based upon the above-cited authority.

## **CONCLUSION**

For the reasons stated above, Clarendon respectfully requests that the Court deny Plaintiffs' Motion for Summary Judgment in its entirety or, in the alternative, that it either: (i) grant Clarendon summary judgment independent of the motion, pursuant to Fed.R.Civ.P.

56(f)(1); or (ii) stay any ruling on the matter until the completion of all discovery in the case and the parties' submission of any revised or supplemental papers based upon the results of such Dated: April 6, 2011

Respectfully submitted,

  /s/ Blake S. Sando         .
Blake S. Sando (FBN: 939293)
E-mail: Blake.Sando@csklegal.com
COLE, SCOTT & KISSANE, P.A.
9150 S. Dadeland Boulevard
Suite 1400
Miami, Florida 33156
Tel:   305-350-5300
Fax:   305-373-2294

  /s/ Adam H. Russ           
Adam H. Russ (*Pro Hac Vice*)
E-mail:  adam@wassruss.com
Wasser & Russ, LLP
80 Maiden Lane, Suite 1502
New York, NY 10038
Tel:   212-430-6040
Fax:   212-430-6041
*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 6th day of April, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro-se parties identified on the attached service list in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

Ann Marie St. Peter-Griffith
Email: astpetergriffith@kasowitz.com
Kasowitz Benson Torres & Friedman LLP
1441 Brickell Avenue, Suite 1420
Miami, FL 33131