UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| RAC Insurance Partners, LLC,<br>Plaintiff<br><br>v.<br><br>Clarendon National Insurance Company,<br>Defendant. | Case No.1:10-cv-24142-FAM |

**AFFIDAVIT OF MICHAEL SHEEHAN IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK   )

Michael Sheehan, being duly sworn, deposes and says:

1. I am a Senior Vice President of the above-named defendant, Clarendon National Insurance Company ("Clarendon"), a property and casualty insurance company. I make this affidavit based upon my personal knowledge, the documents and records in my possession, and, where so indicated, my information and belief, in opposition to Plaintiff's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("FRCP") Rule 56.

2. I have worked in the insurance and reinsurance industry for over 20 years. Since 2006, I have overseen, as Program Manager, the private passenger automobile insurance program produced and administered by RAC Insurance Partners, LLC ("RAC").

- 1 -

## The Dual Factual and Legal Relationship between Clarendon and RAC

3.     Clarendon is a "program insurer," which means that it contracts with other parties who perform, as Clarendon's agent, certain key insurance functions, most notably policy administration and claims administration.

4.     On or about April 1, 2003, Clarendon and RAC entered into two agreements. The first, the General Agency Agreement ("Agency Agreement"), governed the relationship between Clarendon as insurer-principal, and RAC as its general agent. (The Agency Agreement is attached to the Declaration of Enrique A. Cuadra in Support of Plaintiff's Motion for Summary Judgment (the "Cuadra Affid.") as Exhibit A.) The second, the Claims Administration Agreement, governed the relationship between Clarendon as insurer and RAC as its claims administrator. (The Claims Administration Agreement is attached to the Affidavit of Barry Stinson in Opposition to Plaintiff's Motion for Summary Judgment (the "Stinson Affid.") as Exhibit A.)

5.     The two capacities – general agent and claims administrator – are wholly separate and distinct from one another, both functionally and legally, involving as they do entirely different operations, personnel, compensation, sources of funds, record-keeping and reporting, and governed, as they are, by separate legal agreements. Pursuant to the Agency Agreement, RAC serves as Clarendon's underwriter, and as such is responsible for functions at the 'front-end' of the business: producing the business written by Clarendon (*i.e.*, finding and selecting the insureds to purchase Clarendon policies) and then issuing, collecting the premium for, and administering those policies. In contrast, as claims administrator, RAC is involved solely with the 'back-end' of the business, receiving, recording, investigating, adjusting and settling the claims filed by the program's insureds.

6. In most, although not all, cases, Clarendon contracts with two different entities to provide the policy administration and claims administration services for a given program. With respect to the insurance program at issue here, a program of private passenger automobile coverage, the legal entity known as RAC separately contracted with Clarendon to perform: (i) policy administration services under the Agency Agreement; and (ii) claims administration services under the Claims Administration Agreement.

7. The essential point, however, whether one or two entities provide these distinct services, is that the legal agreements embodying and governing the two functions, as well as the functions themselves – including the flow and disposition of different streams of funds, the daily administration of policies on the one hand and claims on the other, the reporting and data collection relating to such administration, and the management of all of the foregoing – are necessarily strictly segregated in accordance with applicable audit principles and requirements, industry standards and practice, and practical necessity. Thus, agents involved with selling, issuing and administering policies are not ordinarily permitted to have anything to do with the administration of claims arising under those policies, and *vice versa.*

8. Evidencing this strict legal and functional division between the two categories of services, the Agency Agreement and its Addenda are all executed on behalf of RAC by Alvarez, the managing partner of RAC in charge of policy issuance and administration (Cuadra Decl., Exh. A, court-numbered pages 12, 39, 50, 54, 56, 61, and 63 of 84), whereas the Claims Administration Agreement and its Addendum are both executed by Cuadra, the managing partner of RAC in charge of claims administration. (Stinson Affid., Exh. A, pp. 3, 23, and p. 2 (unnumbered) of Addendum 1.) Similarly, Clarendon's communications with RAC with respect to policy administration under the Agency Agreement, including the calculation of Adjusted

Commission and the Excess Commission due (the terms Adjusted Commission and Excess Commission are defined below), were conducted with Alvarez, a fact confirmed by the e-mails and correspondence offered by RAC in support of its motion. (*See* Alvarez Decl., Exh. A). Clarendon's dealings with RAC with respect to claims administration, on the other hand, were with Cuadra. Finally, consistent with the separate legal rights and obligations, functions and operations discussed above, Clarendon has conducted separate audits of the discrete policy administration and claims administrations services performed by RAC, just as it would were the functions performed by different entities.

### The Agency Agreement and the Excess Commission Due Thereunder

9. Under the Agency Agreement, as outlined above, RAC is authorized and obliged to issue policies on behalf of Clarendon, collect the premium due on those policies, amend the policies and endorsements as necessary (for example, to add, delete or substitute a covered vehicle or driver), administer and maintain the bank accounts established by Clarendon for the deposit of premium funds, and produce and maintain premium, policy and financial registers and reports in formats prescribed by Clarendon. In return for the performance of its services as policy administrator, RAC is entitled to an initial commission equal to a specified percentage of the premium it collects (the "Provisional Commission"). The Provisional Commission is subject to annual upward or downward adjustment, based upon the profitability of the business. The amount by which the Provisional Commission is either increased or decreased at each annual accounting date is referred to as the Adjusted Commission.

10. The profitability of the business is determined as of April 30th of each year (the "Adjustment Date"), by calculating the ratio of all losses and expenses incurred under the program policies to the total premium collected for the program policies. The ratio of total

losses and expenses to total premiums is called the "loss ratio," and the commission RAC is entitled to is readjusted each year on the basis of a sliding scale of commission rates keyed to the actual loss ratio for all of the program policies as of the Adjustment Date. The sliding scale of commission rates is set forth in Schedule C of the Agency Agreement, as amended by various Addenda. If the amount of commission previously paid to RAC is less than the amount it is due as of the most recent Adjustment Date, RAC is entitled to receive the difference. If the amount RAC has previously received is greater than the amount due as of the Adjustment Date, RAC is obliged to return the difference, referred to herein as Excess Commission. The purpose and result of this business arrangement is to effectuate a sharing among the reinsurers, the insurer (Clarendon), and the general agent (RAC) of the program's overall profitability.

11. The calculation of Adjusted Commission as of April 30, 2009, resulted in Excess Commission due from RAC in the amount of $573,891.71, of which RAC eventually paid just $33,768.57, leaving Excess Commission of $540,123.14 as of that date currently due and owing.[1] A true and correct copy of the calculation of Adjusted Commission and Excess Commission due is attached hereto as Exhibit A.

### The Claims Administration Agreement

12. As outlined above, under the Claims Administration Agreement, RAC is authorized and obligated to perform a wholly different set of services from those set forth in the Agency Agreement – namely to receive, examine, report, document, and investigate all claims filed under the program policies, and to adjust and settle those claims that Clarendon is obligated

---

[1] Due to further deterioration in the program business, additional amounts of Excess Commission are due from RAC as of April 30, 2010 and up to the present. The deterioration in the overall program loss ratios was, and continue to be, significant.

to pay. In return for its claims administration services, RAC is entitled to fees as specified in Article 3 and Exhibit A of the Claims Administration Agreement. These *fees* are entirely separate from and in addition to the *commission* paid to RAC under the Agency Agreement.

13. The separate and distinct nature of RAC's capacities as claims administrator and general agent is evidenced by the separate identification of RAC in each capacity on the Declarations page of the Claims Administration Agreement. (Cuadra Decl., Exhibit A, p. 2.)

### The Cuquejo Claim and the Settlement Agreement

14. One of the many claims arising under the program policies involved an accident in November 2004 between a Clarendon insured, Mr. Olortegui, and a grievously-injured third party, Mr. Cuquejo. Mr. Olortegui was sued by Mr. Cuquejo's guardian. Mr. Olortegui filed a claim (the "Cuquejo Claim") with RAC, as Clarendon's claims administrator, and subsequently a bad faith claim was threatened against Clarendon, alleging improper administration of the Cuquejo Claim. Clarendon in turn sought recovery from RAC as claims administrator under the Claims Administration Agreement.

15. In February 2008, RAC, Clarendon and their respective errors and omissions ("E&O") insurers -- Lexington Insurance Company, RAC's E&O insurer ("Lexington"), Columbia Casualty Company, Clarendon's primary layer E&O insurer ("CCC") and Illinois Union Insurance Company, Clarendon's excess E&O insurer ("Illinois Union") – entered into a Settlement Agreement and Release (the "Settlement Agreement"). Under the terms of the Settlement Agreement, Lexington agreed to contribute $2 million to the $12.5 million settlement of the Cuquejo Claim. (Cuadra Decl., Exh. B, par.1). CCC, Clarendon's primary E&O insurer, contributed $9.2 million, and Clarendon paid the remaining $1.3 million from its own pocket. (Affidavit of Lewis N. Jack, Jr. in Opposition to Plaintiff's Motion for Summary Judgment (the

"Jack Affid."), Exh. A.) RAC itself contributed no funds to the settlement. (Jack Affid. ¶ 8). In consideration of Lexington's contribution of $2 million, Clarendon, CCC and Illinois Union agreed to release any and all claims they had or might have had against RAC and/or Lexington as a result of RAC's administration of the Cuquejo Claim.

16.     In keeping with the separation and distinction between claims administration and policy administration functions discussed above, the Settlement Agreement was executed on behalf of RAC by Cuadra.

### Clarendon's Claim for Excess Commission under the Agency Agreement

17.     In calculating RAC's Adjusted Commission as of April 30, 2009, Clarendon, as a matter of course, included the $1.3 million of net loss that was incurred for the Cuquejo Claim. This is in complete accord with the methodology for determining Adjusted Commission set forth in the Agency Agreement. The losses includible in the calculation of Adjusted Commission are expressly defined to include extra-contractual losses and losses in excess of policy limits such as the Cuquejo losses. (*See* Cuadra Affid., Exh. A, Schedule C, Article 3; Reinsurance Agreement, pp. 7, 8 and 12-13.[2])

18.     RAC contends that the effect of the Settlement Agreement is somehow to extinguish Clarendon's right to include the Cuquejo losses in the calculation of Adjusted Commission under the Agency Agreement. However, the Settlement Agreement contains absolutely no mention of the Agency Agreement or of any potential future claim for Excess Commission thereunder. Rather, it refers solely to Clarendon, CCC and Illinois Union's release

---

[2]     The Reinsurance Agreement is attached hereto as Exhibit B and was attached to Clarendon's New York Complaint, which is attached as Exh. A to Clarendon's Answer in this proceeding.

of claims relating to *RAC's administration of the Cuquejo Claim under the Claims Administration Agreement.* Cuadra Decl., Exh. B, First through Fourth WHEREAS clauses.

19. The released claims all are predicated upon RAC's actual or potential fault, whether framed as breach of contract, negligence, professional liability, bad faith, or otherwise. As such, they are wholly distinguishable from and unrelated to RAC's purely contractual agreement to remit Excess Commission, if and when due, under the Agency Agreement – an obligation in no way premised upon fault or wrong-doing of any kind.

20. Indeed, the inclusion of the net cost of the Cuquejo Claim in the calculation of Adjusted Commission under the Agency Agreement is a purely factual, mathematical, no-fault recognition of one component of total policy losses to be proportionately shared, as provided by the Agency Agreement, among the reinsurers, Clarendon and RAC. As such, it is simply the business deal agreed to by the parties to the Agency Agreement. Correlating the general agent's ultimate commission to the profitability of the insurance program is a standard business arrangement – an arrangement that recognizes the general agent's responsibility as the 'producer' of the business and provides the agent with as much opportunity for reward as for risk. Under such an arrangement, and as expressly provided in the Agency Agreement, the general agent agrees in effect to follow the fortunes of the insurer and reinsurers by reaping the rewards and assuming the risks inherent in, among other things, the losses and expenses associated with claims.

21. As further detailed below, it was never the intention of the parties to the Settlement Agreement to amend the terms of the Agency Agreement, or to modify RAC's rights or obligations with respect to commission thereunder. If such a suggestion had ever been made,

Clarendon would have rejected it, since it would have meant forfeiting claims that had not yet accrued and whose amount could not be foreseen.

22. Moreover, no consideration flowed, or could have flowed, to Clarendon under the Settlement Agreement to induce such forfeiture. As stated above, the only consideration provided for Clarendon's (and its E&O insurers') release was the proceeds of the Lexington E&O policy. That policy expressly excludes *"any Claim ... based on or arising out of the actual or alleged failure to ... return to anybody any ...commission .... "* (*See* Russ Affid., Exh. E, Lexington E&O policy, Exclusion M, p. 6 of 11.)

23. The effect of excluding the net costs of the Cuquejo Claim from the adjusted commission calculation would be to retroactively wave a wand and pretend that these losses were never incurred, and that no sharing of them among Clarendon, the reinsurers and RAC is to be effected. Not only would this flatly contradict the express terms of the Agency Agreement and the Reinsurance Agreement; it would also render the resulting calculation of the program's profitability a fiction and serve to unjustly enrich RAC.

24. Among the many material facts at issue is how the Cuquejo Claim costs would be filtered out of the Adjusted Commission calculation, even assuming the parties *had* intended to do so. The absence of any Addendum to the Agency Agreement setting forth how this is to be done is only more evidence of the fact that there was never any such intention.

## Factual Defects of RAC'S Motion

25. In support of its motion for summary judgment, RAC alleges that no material question of fact is at issue in this dispute. Nothing could be further from the truth. Indeed, RAC has submitted factual affidavits in support of its motion replete with material factual claims vigorously disputed by Clarendon regarding both the calculation and amount of commission due

from RAC under the Agency Agreement (*see, e.g.*, Declaration of Luis Alvarez in Support of Plaintiff's Motion for Summary Judgment ("Alvarez Decl.") ¶¶ 8, 10, 15, 16 and 17) and the intent, scope, factual predicates and meaning of the Settlement Agreement (*see e.g.*, Declaration of Enrique A. Cuadra in Support of Plaintiff's Motion for Summary Judgment ("Cuadra Decl.") ¶¶ 9, 11, 21, 23 and 29.[3]) On information and belief, these fact questions alone defeat RAC's motion.

26. No matter how much RAC may seek to gloss over or obscure the important factual questions in dispute, those questions simply cannot be ignored or erased. The nub of RAC's case is succinctly set forth in its Motion for Summary Judgment and Incorporated Memorandum of Law ("MOL") as follows:

> Clarendon asserts that the Settlement Agreement only releases claims attributable to RAC's errors and omissions claims ("E&O claims"). (SOF ¶ 18). This argument fails for two reasons: (i) the Settlement Agreement is unambiguous that the scope of the release encompasses more than E&O claims, and (ii) Clarendon could have, but failed to, preserve any claims attributable to the Cuquejo Claim against RAC, or Cuadra or Alvarez as guarantors under the Agency Agreement.

(RAC MOL, p.10.)

27. In stark contrast to both prongs of RAC's claim, however, we know definitively, from the contemporaneous email sent by Lexington's counsel, Scott Newman, to the counsel for the four other parties to the Settlement Agreement -- including RAC's counsel, Francisco R. Angones (Cuadra Decl., ¶24) -- that the claims released were *precisely* limited to the "E&O claims." Mr. Newman stated:

> Gentleman – While a formal letter is being prepared, please accept this email in follow up to our earlier conversations. On behalf of Lexington, please allow this to confirm the

---

[3] For Clarendon's opposing view of these material factual questions, *see* its Statement of Material Facts in Dispute and Additional Undisputed Material Facts in Opposition to Plaintiff's Motion for Summary Judgment ("SOMFID").

- 10 -

resolution of *the potential E&O claims by Clarendon, Columbia Casualty and Illinois Union against Lexington's insured, RAC Partners, LLC.* (Jack Affid., Exh. B; emphasis added.)

28.     RAC's counsel, Mr. Angones, raised no objection to this limitation. Clarendon's counsel, Mr. Jack, affirmed Mr. Newman's statement in his reply and in addition stated: "Scott: Thanks. *No questions here. The release by Clarendon in favor of RAC should be limited to this specific Cuquello [sic] case.* Lew." (Jack Affid., Exh. C; emphasis added.)

29.     It is thus clear beyond cavil not only that the Settlement Agreement most certainly limits the claims released to the E&O claims, but also that: (i) the parties expressly signaled their recognition of, and consent to, this limitation and (ii) Clarendon in fact expressly reserved its rights with respect to all claims other than the specific Cuquejo E&O claims. Thus the two essential prongs of RAC's case are both without merit and, on information and belief, its motion must accordingly fail.

30.     Moreover, we know that there could have been no consideration provided for Clarendon's release of its commission claims under the Agency Agreement because: (i) RAC itself provided no consideration at all for Clarendon's release (*see* Jack Affid. ¶ 8), and (ii) the consideration provided by Lexington could not possibly have related to Clarendon's commission claims under the Agency Agreement because the Lexington E&O policy expressly excludes "any Claim ... based on or arising out of the actual or alleged failure to ... return to anybody any ...commission ...." (Russ Affid., Exh. E (Lexington E&O Policy), Exclusion M, p. 6 of 11; emphasis added.)

31.     Finally, we have RAC's own contemporaneous admission that the Settlement Agreement had no effect whatever upon the commission due under the Agency Agreement. Addendum No. 5 of the Agency Agreement, which revises the initial and sliding scale

commission rates to be applied, was signed by Mr. Alvarez on behalf of RAC *just two weeks after the Settlement Agreement was executed.* (Cuadra Decl., Exh. A, court-numbered pages 62-63 of 84; Cuadra Decl., Exh. B, pp. 6 and 7.) In Addendum No. 5, Mr. Alvarez agreed on behalf of RAC that apart from the revised rates set forth in Addendum No. 5, "[t]he parties wish to ... otherwise ratify their obligations under the Agreement." Addendum No. 5 makes no mention of the Cuquejo Claim and makes no amendment to adjusted commission due based upon the Cuquejo Claim or the Settlement Agreement. Accordingly, RAC has itself ratified the validity of Clarendon's claim for the Excess Commission.

WHEREFORE, it is respectfully requested that the Court deny Plaintiff's motion for summary judgment in its entirety and grant such other and further relief as it deems just, proper and equitable.

Dated: April 5, 2011

                                                             Michael Sheehan

Sworn to before me
this 5th day of April, 2011

Notary Public

JESSICA M. MIELES
Notary Public, State of New York
No. 01MI6146044
Qualified in Queens County
Commission Expires May 15, 2014