UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:10-cv-24143-Moreno/Torres

RAC Insurance Partners, LLC,         )
Plaintiff,                           )
                                     )
v.                                   )
                                     )
Clarendon National Insurance Company,)
Defendant                            )
                                     )
_____)

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION *IN LIMINE***

Defendant Clarendon National Insurance Company ("Clarendon") submits this Memorandum of Law in opposition to the Motion *in Limine* and Incorporated Memorandum of Law (the "Motion") submitted by Plaintiff RAC Insurance Partners, LLC, seeking to preclude Clarendon from "introducing into evidence information and testimony concerning the parties' intentions at the time of the negotiation of the Settlement Agreement [as defined below], or evidence concerning the parties' intent that is not contained within the four corners of the Settlement Agreement." Motion, p. 8. [D.E. 47] More specifically, RAC seeks to exclude the portions of the Affidavits of Michael Sheehan ("Sheehan Affid.") [D.E. 32], Barry Stinson ("Stinson Affid.") [D.E. 30], and Lewis N. Jack ("Jack Affid.") [D.E. 33] relating to their 'negotiation intent' with respect to the Settlement Agreement.

**SUMMARY OF THE FACTS AND CORRECTION OF PLAINTIFF'S
MISSTATEMENT OF THE FACTS**

A.   **The Facts in a Nutshell**

Clarendon, an insurance company, and RAC, a licensed insurance agent and claims administrator, entered into two separate and distinct agreements effective as of April 1, 2003. Sheehan Affid. at ¶¶ 3-8 and DSOF ¶¶ 11-12.[1]  Pursuant to the General Agency Agreement ("GAA"), RAC agreed to act as Clarendon's general agent by issuing and administering a program of private passenger automobile insurance policies underwritten by Clarendon in Florida (the "Program Policies"). [*Id.*]  Pursuant to the Claims Administration Agreement ("CAA"), RAC agreed to act as Clarendon's claims administrator, administering the claims that arose under the Program Policies. [*Id.*]  The two sets of function, like the agreements that govern them, are wholly separate and distinct, involving as they do entirely different operations, personnel, compensation, sources of funds, record-keeping and reporting. [*Id.*]

The instant controversy arises from Clarendon's claim against RAC for excess commission due as of April 30, 2009 pursuant to the GAA. [D.E. 1, 9, 29, 31 and 32]  RAC refused Clarendon's demands for payment and in September 2010 Clarendon brought an action in New York to recover the amount due. [*Id.*]  RAC subsequently commenced this action, in which it argues that Clarendon released RAC from the obligation to pay the excess commission in question pursuant to the Settlement Agreement, as defined below, entered into by Clarendon, RAC and several other parties in 2008. [D.E. 1]

### B.   The Facts Giving Rise to the Settlement Agreement

In 2004, a Clarendon insured named Olortegui was involved in an accident in which a third party named Cuquejo was grievously-injured. (Stinson Affid. ¶ 5).  Olortegui was sued by Cuquejo's guardian and Olortegui filed a claim (the "Cuquejo Claim") with RAC as Clarendon's claims administrator.  Olortegui subsequently accused Clarendon of bad faith based upon RAC's

---

[1] "DSOF" refers to Defendants' Rule 7.5 Statement of Material Facts in Dispute and Additional Undisputed Material Facts in Opposition to Plaintiff's Motion for Summary Judgment [D.E. 29].

allegedly improper administration of the Cuquejo Claim. Clarendon in turn sought recovery from RAC pursuant to the CAA. (*Id.*)

In February 2008, Clarendon, RAC and their respective errors and omissions ("E&O") carriers entered into a settlement agreement (the "Settlement Agreement"). (Stinson Affid. ¶ 8). Under the Settlement Agreement, RAC's E&O insurer, Lexington Insurance Company, agreed to contribute $2 million to the $12.5 million settlement of the Cuquejo Claim. (*Id.*) In return, Clarendon and its E&O insurers agreed to release RAC and Lexington from any and all claims Clarendon or its E&O insurers had or could have had as of the date of the Settlement Agreement relating to RAC's administration of the Cuquejo Claim pursuant to the CAA. (Stinson Affid. ¶ 10).

The nub of the instant controversy is the scope of the Settlement Agreement and, more specifically, whether the Settlement Agreement can properly be construed to have released RAC from a commission claim (*i.e.*, a non-E&O claim) arising under the GAA rather than the CAA. [*See* D.E. 1 and 9]. RAC alleges that it can. Clarendon maintains that it cannot.

### C. Clarendon's Commission Claim

Pursuant to the GAA, the amount of commission payable to RAC for its services as general agent is re-calculated and adjusted as of April 30th of each year, based upon the loss ratio of the Program Policies (*i.e.*, the ratio of the total losses incurred under the Program Policies to the total premium collected under the Program Policies as of the calculation date). (Sheehan Affid. ¶¶ 9 – 11; see also D.E. 1 and 9). If the amount previously paid to RAC is less than the amount shown to be due based on the most recent calculation, Clarendon must pay RAC the difference. (Sheehan Affid. ¶ 10). Conversely, if the amount previously paid to RAC is more than the amount shown to be due based upon the most recent calculation, RAC must remit the

3

difference to Clarendon. (*Id.*) The purpose of adjusting the commission based upon the loss ratio is to effect an equitable sharing of the profits (or losses) of the Program Policies among the insurer, the reinsurers and the general agent. (*Id.*)

In July and August of 2009, Clarendon billed RAC for approximately $573,000 of excess commission RAC had received, based upon the commission calculation as of April 30, 2009. (Sheehan Affid. ¶ 11 and Exhibit A). That calculation included, as one component of total losses, the net $1 million of Cuquejo Claim losses paid by Clarendon out of pocket (the "Net Cuquejo Losses").[2] (Sheehan Affid. ¶ 17).

RAC refused, and has continued to refuse, to repay the portion of excess commission attributable to inclusion of the Net Cuquejo Losses in the commission calculation (the "Excess Commission"). (Sheehan Affid. ¶ 18; see also RAC's Complaint – D.E. 1]. RAC argues that Clarendon's release of RAC in the Settlement Agreement included a release of Clarendon's claim for the Excess Commission due under the GAA. (Complaint – D.E. 1). Clarendon maintains that it did not. (Clarendon's Answer – D.E. 9).

From April 30, 2009 to April 30, 2011, the Excess Commission declined in value from approximately $540,000.00 to approximately $370,000.00, as the overall RAC program business continues to deteriorate and the Net Cuquejo Losses come to represent an ever smaller component of the overall deterioration.

### D.   RAC's Misstatement of the Facts

For purposes of this Motion, RAC asserts that the sole subject matter of this action is the Settlement Agreement and that, accordingly, the Court need look no further than the four corners of the Settlement Agreement itself. RAC's complaint, however, proves otherwise. The

---

[2] The remaining $11.5 million of the $12.5 million Cuquejo claim costs had been paid by the E&O insurers and the reinsurers.

complaint expressly asks this court to rule that the Settlement Agreement was intended to, and did, amend and novate the GAA. [RAC's Complaint - D.E. 1 at ¶¶34, 52; items 1, 2(a), (b) and (c) of the Prayer for Relief; Exh. B.]  In fact, RAC cannot obtain the relief it seeks – insulation from liability for the Excess Commission -- unless this Court makes such a ruling, and in recognition of that fact RAC attached both the Settlement Agreement and the GAA to its complaint.  [See Complaint, Exhibits A and B – D.E. 1-3 and 1-4].

Moreover, in order to grant the relief RAC seeks, this Court must hold that the Settlement Agreement amended and novated the GAA *sub silentio*, for the Settlement Agreement contains no mention of either the GAA or the subject matter of the GAA.  [*See* D.E. 1-3]  Rather, the Settlement Agreement explicitly references, and exclusively concerns, only the relationship between RAC and Clarendon, and their respective rights and duties, under the *CAA*.  [*Id*.]

Thus it is clear that the true subject matter of this action is not the Settlement Agreement in isolation, but the relationship or intersection, if any, among the Settlement Agreement, the GAA and the CAA.  Given the lack of any mention of, or reference to, the GAA in the Settlement Agreement, this Court must determine whether Clarendon's claim for the Excess Commission nevertheless falls within the class of claims that are embraced within the Settlement Agreement's release – a class of claims that expressly includes E&O claims under the CAA but does not expressly include claims under the GAA.  [Settlement Agreement – D.E. 1-3, 1st through 4th WHEREAS Clauses, pars. 1-4.]  To make its determination the Court must consider the relationship, if any, between claims arising under the CAA and the GAA, and must inquire whether it is appropriate to conclude, given the distinct nature of the parties' rights and obligations under the two agreements, and the factual context giving rise to the Settlement

Agreement, that commission claims under the GAA were intended by the parties to be included among the released claims.

The Sheehan Affidavit addresses and elucidates precisely these questions, clarifying the parties' respective rights and duties under the GAA and CAA in light of their overall business relationship, and thereby demonstrating that the class of claims released in the Settlement Agreement cannot properly be deemed to include the claim for Excess Commission because: (i) the claim for Excess Commission is a purely contractual claim, whereas the claims released under the Settlement Agreement are all based upon fault (Sheehan Affid. ¶19); (ii) Clarendon's claim for Excess Commission did not accrue until at least April 30, 2009, more than a year after the Settlement Agreement was executed, and the Settlement Agreement expressly excludes claims that had not yet accrued (Sheehan Affid. ¶¶21, 22); (iii) under the Settlement Agreement, no consideration was provided to support Clarendon's release of its Excess Commission claim because RAC itself provided no consideration and the $2 million paid by Lexington expressly excluded "any Claim … based on or arising out of the actual or alleged failure to … return to anybody any … commission …" (Russ Affid., Exh. E)[3]; and (iv) two weeks after the execution of the Settlement Agreement, Clarendon and RAC expressly reaffirmed the terms of the GAA, making no reference to any amendment or novation as a result of the Settlement Agreement or the Cuquejo Claim. (See, Addendum No. 5 to the GAA - D.E. 1-4, pp. 54 and 55 of 55).

Further, the statements in the Sheehan, Stinson and Jack Affidavits regarding the parties' intent in executing the Settlement Agreement, and the correspondence attached to the Jack Affidavit evidencing that intent, are not adduced for the purpose of *varying or contradicting* the plain meaning of the Settlement Agreement, but in order to to *support and confirm* that meaning.

---

[3] "Russ Affid." refers to the Affidavit of Adam H. Russ in Opposition to Plaintiffs Motion for Summary Judgment [D.E. 31].

[D.E. 30, 32, 33, 33-1, 33-2, 33-3]  It is RAC -- not Clarendon -- that seeks to vary the meaning of the Settlement Agreement by expanding the class of claims released beyond those specifically referenced.  [D.E. 1]  By doing so RAC is necessarily arguing that the limiting language contained in the First through Fourth WHEREAS Clauses, and in Paragraphs 1 through 4 of the Settlement Agreement, must be deemed ambiguous.[4]  [*See* D.E. 1-3]  That language exclusively references RAC's obligations and Clarendon's rights under the *CAA*, and Clarendon's claims against RAC as a result of RAC's alleged mishandling of the Olortegui claim pursuant to the *CAA*.  [*Id.*]  Nevertheless, RAC argues, the limiting language must be interpreted to also include claims for excess commission under the GAA that had neither accrued nor were in any way related to RAC's duties under the CAA.

In order to determine the scope of the Settlement Agreement's release, this Court must decide whose reading of the meaning and effect of the limiting language is correct.  As the cases cited below and in RAC's own Motion make clear, ambiguity exists, and extrinsic evidence is admissible, when the language of a contract, settlement agreement or release is reasonably susceptible to more than one construction.  Here, Clarendon and RAC put forward reasonable, but mutually exclusive, constructions of the limiting language.

Accordingly, all of the affidavits, exhibits and other evidence submitted by Clarendon are relevant and admissible and RAC's Motion should be denied.[5]

## THE LAW

---

[4] Clarendon sets forth the text of the limiting language and discusses its import in detail in its Memorandum of Law in Opp to Plaintiff's Motion for Summary Judgment [D.E. 28 at pp. 12-15]. This language flatly contradicts RAC's characterization of the release as a general release.

[5] This matter will be tried not by a jury but by a judge, who need not be precluded from considering the evidence adduced by both parties and according it the weight it deserves.

In construing a written contract -- whether a settlement agreement, a release, a maritime contract, an easement or other agreement -- the intent of the parties is controlling. *Barnett v. Destiny Owners Association, Inc.,* 856 So.2d 1090, 1092 (Fla. 1st DCA 2003); *Moore v. Stevens*, 90 Fla. 879, 106 So. 901, 903-04 (Fla. Sup.Ct. 1925); *F.W.F., Inc. v. Detroit Diesel Corporation*, 494 F.Supp.2d 1342, 1357 (S.D. Fla. 2007). The primary function of a court is to ascertain and give effect to that intent. *Id*. As stated by the Court in *Bombardier Capital Inc. v. Progressive Mktg. Group, Inc.,* 801 So.2d 131, 134 (Fla. 4th DCA 2001): "The polestar guiding the court in the construction of a written contract is the intent of the parties" (quoted in *Okeechobee Landfill, Inc. v. Republic Services of Florida, Limited Partnership*, 931 So.2d 942, 944-45 (4th DCA 2006).

The intent of the parties must be determined from an examination of *the contract as a whole*. *Okeechobee Landfill, Inc.*, 931 So.2d at 945; *F.W.F., Inc*., 494 F.Supp.2d at 1357; *Canal Lumber Co. v. Fla. Naval Stores & Mfg. Co.*, 83 Fla. 501, 92 So. 279, 281 (Fla. Sup.Ct. 1922). As stated by the Supreme Court of Florida in *Canal Lumber Co*.: "It is not enough to look to an isolated phrase or paragraph of the contract in an effort to determine its true meaning." *Canal Lumber Co.*, 83 Fla. at 507, 92 So. at 281.

If all of the provisions of a contract read together as a whole are unequivocal, clear, undisputed and not subject to conflicting inferences, the contract is unambiguous and may be enforced according to its terms. *Campaniello v. Amici Partnership*, 832. So.2d 870 (Fla. 4th DCA 2003); *F.W.F., Inc.*, 494 F.Supp.2d at 1357. However, where the language or import of an agreement "is uncertain and may be fairly understood in more ways than one and is susceptible of interpretation in opposite ways" the agreement is ambiguous. *Barnett*, 856 So.2d at 1092, citing *Friedman v. Virginia Metal Products Corp*., 56 So.2d 515, 517 (Fla. 1952); *see also*

*American Quick Sign, Inc. v. Reinhardt*, 899 So.2d 461, 465 (Fla. 5th DCA 2005).  Moreover, where each side argues that a contract is clear and unambiguous, but ascribes a different meaning to the "unambiguous" instrument, the contract is rendered ambiguous.  *Killearn Homes Association, Inc. v. Visconti Family Limited Partnership*, 21 So.3d 51 (Fla 1st DCA 2009); *Campaniello*, 832 So.2d at 870; *Birwelco-Montenay, Inc. v. Infilco Degrement, Inc*., 827 So.2d 255 (Fla. 3rd DCA 2001).

Where contractual language is reasonably susceptible to more than one interpretation, and is therefore ambiguous, it is necessary and proper for the court to consider extrinsic evidence in order to ascertain the intent of the parties at the time the contract was entered into.  *Barnett*, 856 So.2d at 1092; *American Quick Sign, Inc*., 899 So.2d at 466; *Emerald Pointe Property Owners Association, Inc. v. Commercial Construction Industries, Inc.*, 978 So.2d 873, 877 (Fla. 4th DCA 2008); Okeechobee Landfill Inc., 931 So.2d at 945.  This is especially true when, as here, the ambiguity raises a question regarding the contract's scope.  *American Quick Sign, Inc*., 899 So.2d at 466-67, and cases there cited.

Here, the ambiguity arises because the Settlement Agreement neither expressly includes nor expressly excludes the claim for Excess Commission under the GAA.  Clarendon and RAC read the Settlement Agreement as a whole, including the limiting language contained in the WHEREAS Clauses and in Paragraphs 1 through 4, in mutually exclusive ways.  Their differing interpretations serve to expand or contract the scope of the Settlement Agreement and release.  Clarendon deems the limiting language controlling and argues that it limits the claims released to those arising under or related to the CAA; RAC, citing the breadth of the language used to describe the forms and theories of recovery included in the release (negligence, bad faith, indemnification, subrogation, etc.) argues otherwise.

9

Under these circumstances, and in accordance with the case law cited above, the extrinsic evidence adduced by Clarendon, including the evidence regarding the parties' intent at the time of the execution of the Settlement Agreement set forth in the Affidavits and related exhibits of Michael Sheehan, Barry Stinson, and Lew N. Jack, is relevant and material and should be admitted.

WHEREFORE, based upon all of the foregoing, Plaintiff Clarendon National Insurance Company respectfully asks that the Court deny Plaintiff's Motion in its entirety.

Dated: August 9, 2011

          Respectfully submitted,

            /s/ Blake S. Sando           .
          Richard P. Cole (FBN: 186589)
          E-mail: Richard.Cole@csklegal.com
          Blake S. Sando (FBN: 939293)
          E-mail: Blake.Sando@csklegal.com
          COLE, SCOTT & KISSANE, P.A.
          9150 S. Dadeland Boulevard
          Suite 1400
          Miami, Florida 33156
          Tel:     305-350-5300
          Fax:    305-373-2294

            /s/ Adam H. Russ           
          Adam H. Russ (*Pro Hac Vice*)
          E-mail:  adam@wassruss.com
          Wasser & Russ, LLP
          80 Maiden Lane, Suite 1502
          New York, NY 10038
          Tel:     212-430-6040
          Fax:    212-430-6041

          Attorneys for Defendant